# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

MICHELLE KING,

        Plaintiff,

v.                                   ACTION NO. 4:15cv69

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Michelle King ("King"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying King's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference dated September 15, 2015, assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that King's motion for summary judgment (ECF No. 14) be GRANTED, the Commissioner's motion for summary judgment (ECF No. 16) be DENIED, the decision of the Commissioner be VACATED, and the case be REMANDED to the Social Security Administration for further proceedings consistent with this report and recommendation.

## I. **PROCEDURAL BACKGROUND**

King filed applications for DIB and SSI on August 23, 2013, R. 164-78,[1] alleging she became disabled on April 30, 2010 due to costochondritis, upper and lower back pain, migraines, and high blood pressure. R. 164, 171, 259. The Commissioner denied King's applications on December 26, 2013 and, upon reconsideration, on June 5, 2014. R. 63-65, 81-84. At King's request, an Administrative Law Judge ("ALJ") in Atlanta heard the matter on October 15, 2014, and at that hearing received testimony from King (who was represented by a non-attorney representative) and an impartial vocational expert ("VE"). R. 37-59. On January 20, 2015, the ALJ denied King's claims, finding that she had no severe impairments and she was not disabled. R. 19-36.

On May 12, 2015, the Appeals Council denied King's request for review of the ALJ's decision. R. 1-6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2012); 20 C.F.R. §§ 404.981, 416.1481 (2016). Having exhausted all administrative remedies, King filed a complaint with this Court on July 10, 2015. ECF No. 3. The Commissioner answered on September 11, 2015. ECF No. 8. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on October 15 and November 16, 2015, respectively. ECF Nos. 14-15, 16-17. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II. **RELEVANT FACTUAL BACKGROUND**

### A. *King's Background*

Michelle King was born in 1969 and was 40 years old on April 30, 2010, the onset date of her alleged disability. R. 164. King completed high school and previously worked as a janitor

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

and housecleaner. R. 42-43. At the January 20, 2015 hearing before the ALJ, King reported suffering from joint pain, costochondritis (inflammation of the chest), numbness, and high blood pressure. R. 45. King contends that the severity of her condition precludes her from performing any work. R. 45-47.

### B. *Relevant Medical Record from the Alleged Onset Date - April 30, 2010*

On July 28, 2010, three months after her alleged onset date, King was examined by Aladee Delahoussaye, M.D., with Southeastern Virginia Health System. R. 434-35. The primary reason for King's visit was to have a pregnancy test, which was negative. R. 434, 474. Notes from the visit indicate King was doing well without complaints. R. 434.

The record reflects that King was next seen by Dr. Delahoussaye over one year later, on September 19, 2011. R. 432. King's chief complaint was hypertension, and her blood pressure was 120/74. *Id.* King's physical exam was unremarkable, and Dr. Delahoussaye prescribed atenolol to treat her hypertension. *Id.*

Eight months later, on May 10, 2012, King reported to Nurse Practitioner Laura Knee at Grady Hospital in Atlanta, Georgia that she had experienced recurring chest pain for the past eight years and two weeks of bilateral leg swelling that was improving. R. 364. King reported she was currently unemployed and in a job search program, and requested a work excuse due to chest discomfort. R. 364-65. Juron Foreman, M.D., noted that King's chest pain had started three to four weeks prior when King started to look for work. R. 365. King's physical exam was normal, with a normal range of motion and no edema or tenderness, but some chest pain when palpated. R. 365, 375. An electrocardiogram was performed with normal results. R. 368. Jamlik-Omari Johnson, M.D., reviewed King's chest x-ray results and found no evidence of an acute cardiopulmonary process. R. 372. Dr. Foreman recommended ibuprofen for

3

costochondritis. R. 367. Chikha Sharma, M.D., explained the hospital could not write a work excuse for King, and advised King to take Motrin for her pain. *Id.* Constantine Zacha Zaharis, M.D., also explained to King that a work excuse would not be provided by the emergency department and that she should follow up with her primary care physician. R. 371. Notes from the encounter indicate, "[t]his is a chronic problem and patient seems to just want a work excuse. . . . Low to no suspicion for any emergent causes of [chest pain]. Patient encouraged to use Motrin o[r] Tylenol for pain control." R. 375.

On October 16, 2012, King told David Lorenzo, M.D., with Southeastern Virginia Health System, that she had elevated blood pressure and costochondritis, and needed forms completed for social security. R. 430. Dr. Lorenzo assessed King with costochondritis, hypertension-benign, and diarrhea. R. 431. He recommended that King continue taking ibuprofen for pain due to costochondritis and start taking loperamide hydrochloride for diarrhea. *Id.*

On April 5, 2013, King went to see Dr. Lorenzo for a follow up of her costochondritis symptoms and to refill her prescriptions. R. 428. She explained that she had episodes of chest pain when she overexerted herself, and that loperamide stopped her diarrhea. *Id.* Dr. Lorenzo assessed hypertension-benign, diarrhea, and costochondritis, and instructed King to continue on her medications. R. 428-29.

On May 9, 2013, Dr. Lorenzo examined King and his assessment was hypertension-benign, urinary frequency, and incontinence. R. 421-22. King was instructed with regard to pelvic exercises for incontinence, continued on ibuprofen for pain, and continued on loperamide hydrochloride for diarrhea. R. 422. Dr. Lorenzo ordered the following tests: a comprehensive metabolic panel, urine dip, thyroid cascade panel, lipid panel and cholesterol/HDL ratio. R. 446-52. In each instance, King's results were normal. *Id.*

4

On May 31, 2013, John D. Lasater, M.D., with Urology of Virginia, examined King following a referral from Dr. Lorenzo. R. 482-83. Dr. Lasater noted King's report of an eight-year history of lower urinary tract symptoms and leakage. R. 482. Examination revealed a normal urethra and bladder, but King's uterus was "down a bit." *Id.* Dr. Lasater had King set up a bladder diary and start a trial of Vesicare. *Id.*

King followed up with Dr. Lasater on June 25, 2013. R. 482-83. The bladder diary revealed extreme sensory urgency with volumes ranging from drops to six ounces. R. 482. Dr. Lasater assessed King with urinary urgency incontinence, urinary frequency, nocturia, and a sense of incomplete emptying of her bladder. R. 484. He prescribed Toviaz. *Id.*

On July 1, 2013, Dr. Lasater wrote a letter "to whom it may concern," stating that King had reported that her overactive bladder was preventing her from riding the bus to her appointments. R. 417. Dr. Lasater noted that King was taking prescription medication to help with the overactive bladder, and that "the evaluation for this condition has not been completed at this time." *Id.*

King returned to Dr. Lorenzo on August 8, 2013. R. 419-20. King reported joint pain for the previous three months that was moderate to severe and aggravated by physical activity. R. 419. King indicated that she was performing a housekeeping job 2 ½ hours one day each week, and requested that Dr. Lorenzo complete forms "for disability." *Id.* With the exception of a tender lower spine, King's examination was normal with negative straight leg raising, no swelling or tenderness in her hands, knees, shoulders, elbow, or ankles, and a good range of motion. R. 420. Dr. Lorenzo assessed joint pain in multiple joints, back pain, costochondritis and benign hypertension. *Id.* He prescribed ibuprofen for joint pain, methocarbamol for back pain, and instructed King to continue taking her hypertension medication. *Id.* He also ordered

several tests: a comprehensive metabolic panel that was normal, an ANA (antinuclear antibodies) with reflex test that was negative, and a rheumatoid arthritis factor test that was negative. R. 444-47.

On January 16, 2014, King asked Dr. Lorenzo if she could be tested for fibromyalgia. R. 488. King reported headaches for the previous four years with intermittent throbbing and tightness that was moderate to severe and aggravated by light and noise. *Id.* She also reported paresthesias and numbness that was intermittent in both hands and feet, which began after taking the antibiotic Cipro. *Id.* Examination results were normal with the exception of tenderness in the lower spine. R. 489. Dr. Lorenzo assessed hypertension-benign, back pain, joint pain in multiple joints, headache, and paresthesias/numbness. *Id.* He instructed King to continue atenolol, and to start taking Neurontin and methocarbamol for back pain, meloxicam for joint pain, Phrenilin for headache, and vitamin D3. *Id.* Dr. Lorenzo provided King with a letter asking that King be excused from volunteer work. *Id.*

### C.   *Medical Opinions and Residual Functional Capacity Assessments*

On August 8, 2013, in conjunction with his examination of King, Dr. Lorenzo completed a physical capacities evaluation indicating a diagnosis of multiple joint pain, hypertension and back pain. R. 491. King's symptoms were described as joint pain in the back, hands, wrists, shoulders, elbows, knees and ankles. *Id.* Dr. Lorenzo indicated that these symptoms would frequently interfere with the attention and concentration needed to perform simple work-related tasks. *Id.* He opined that in an eight-hour work day, King could sit for two hours, stand for one hour, and walk for one hour, and would need to alternate between these positions every hour. *Id.* He further indicated King would need to take unscheduled breaks every two hours for 15 minutes. R. 493. King could frequently lift and carry up to ten pounds, and could occasionally

lift and carry up to 20 pounds. R. 492. She could occasionally bend, squat, crawl, climb, and reach above shoulder level, and had moderate environmental restrictions. R. 493. Dr. Lorenzo further indicated King would be limited when doing repetitive reaching, handling, or fingering, and, in an eight-hour day could use her hands for simple grasping 50% of the time, for pushing and pulling 20% of the time, and for fine manipulation 50% of the time. R. 492.

On December 23, 2013, a non-examining state agency physician, Navjeet Singh, M.D., reviewed King's medical record as well as King's statements regarding her condition, and opined that King had no severe impairment. R. 63-64. Dr. Singh discussed the medical record, and the diagnoses of benign hypertension and a history of costochondritis treated with ibuprofen. R. 63. Dr. Singh noted King's report that atenolol was making her forgetful, which King explained required her to write things down. *Id.* Dr. Singh opined that there was no medically determinable impairment to substantiate King's claims of pain all over, and King's impairments were non-severe. R. 63-64.

Dr. Lorenzo completed an "Opinion re: Ability To Do Work-Related Activities (Physical)" on November 4, 2014. R. 524-25. There are no notes indicating an examination took place that day. Dr. Lorenzo indicated that King could stand and walk less than two hours and sit less than two hours during an eight-hour day. R. 524. She would need to shift between standing and sitting at will, and would need to lie down every hour. *Id.* King could occasionally lift ten pounds, frequently lift less than ten pounds, and occasionally twist, stoop, crouch and climb. R. 524-25. Her joint pain would be worsened by reaching, fingering, pushing, pulling, handling, and feeling. R. 525. King's symptoms would constantly interfere with the attention and concentration needed to perform simple work-related tasks, and would cause her to be absent from work more than four days per month. *Id.* Dr. Lorenzo indicated that the medical findings

supporting these limitations were multiple joint pain, back pain, headache, and numbness and burning sensation in King's hands and feet. *Id.* Dr. Lorenzo further stated that King needed an assistive device (cane) for ambulation and that her symptoms and limitations began in 2012. *Id.*

On June 5, 2014, a second, state agency, non-examining physician, Maxwell Eidex, M.D., reviewed King's record during the reconsideration of her applications. R. 81-82. Dr. Eidex reviewed the entire record, including the new medical evidence and statements made by King after Dr. Singh's review. *Id.* Dr. Eidex concurred with, and found no evidence to alter, Dr. Singh's assessment that King had no severe impairments. R. 81.

### D.     *King's Statements*

King completed two written function reports, in October 2013 (R. 267-74) and May 2014 (R. 295-302) discussing how her impairments limit her activities. She also wrote a letter in September 2014 discussing her condition (R. 498-514), and testified in October 2014 at her hearing before the ALJ. R. 37-55.

#### 1.     *King's Written Statements*

On October 28, 2013, King completed a function report form. R. 267-74. At the time, King was living alone in public housing. R. 267. With respect to her activities, King reported she was able to take care of her personal hygiene, cook meals, clean the bathroom, kitchen and bedroom, take out the trash and go to the mailbox three times each week, and walk to the store and do laundry one time each week. *Id.* King indicated she had a driver's license and had no problem driving, but did not have a car. R. 270. She left the house three days a week and walked or used public transportation. *Id.* She could pay bills, count change, handle a savings account and use a checkbook. *Id.* King described the following symptoms: diarrhea, stomach pain, urgent need to urinate, pain in her chest, back, foot, arm and leg, migraines, shortness of

breath, rapid heartbeat, fatigue, dizziness, insomnia, and "brain fog." R. 267-70. Her symptoms made it difficult to get comfortable or sleep at night, to get out of bed, to stay in one position for any length of time, to cook, or to walk more than one-half of a block. R. 268-70. King reported difficulty with her memory requiring her to write everything on a calendar, a need to use the restroom every 45 minutes, a need to review written instructions three times, and difficulty handling stress, though she reported she got along with authority figures "great." R. 272-73. With respect to hobbies and activities, King stated that she watched television and volunteered at church, though the church just allowed her to attend to keep her spirits up. R. 271.

King filled out a second function report form on May 18, 2014. R. 295-302. At that time, King was homeless. R. 295. King reported that she could do laundry, cook one meal a day, clean the bathtub, sink and toilet, walk one-half a block before needing to rest for 30 minutes, shop once a week, pay bills, count change, handle a savings account, and use a checkbook. R. 297-98. King stated she suffered from chronic costochondritis that feels like a hole in her chest; chronic paresthesia that makes her hands and feet feel like they are frozen; chronic headaches that feel like her brain is swelling; chronic pain in her neck, shoulder, and back; and, a sensation of popping, snapping and pins and needles in her knee, legs, elbows, and arm. R. 295. She reported being on bed rest for the previous three months, and that it was challenging to stand to cook, get in and out of the bathtub, do paperwork, walk, or to sit for an hour. R. 296. King stated she was unable to lift a case of water or a laundry bag due to chronic pain, she got headaches when doing paperwork, using a computer, or dealing with people, and she needed to stay close to a toilet due to her bladder and diarrhea. R. 300. King reported that her medications caused brain fog, ringing in her ears, dental problems, dizziness, fatigue, light headedness, upset stomach, nausea, and dry mouth. R. 300-02.

On September 1, 2014, King wrote a letter to her attorney outlining her impairments and symptoms. R. 498-514. King explained that she had not seen a doctor since her move to Georgia, and that she had been "almost confined" to a bed for the previous eight months, using a portable toilet, taking sponge baths, and using a cane. R. 498. King reported having a migraine for three months with dizziness, brain fog, and memory loss; severe chest pain with trouble breathing and costochondritis; severe neck, shoulder and back pain with spasms, muscle weakness in hips and knees, paresthesia in her arms, legs, hands and feet, and joint pain with inflammation from head to toe; bladder problems, diarrhea, reflux, and stomach upset; high blood pressure, insomnia, ringing in her ears, and dental problems. R. 498-507. King stated that she needed help with cooking, laundry, cleaning, shopping, and was no longer able to use public transportation. *Id.* She attached paperwork from her prescription medications with the sections discussing potential side effects highlighted. R. 510-14.

### 2. *King's Testimony before the ALJ*

At the hearing on October 15, 2014, King stated she completed high school and a one-year course to earn a certificate in child development. R. 42. With respect to her past work, King indicated that she had performed janitorial and housekeeping work for a variety of companies and had last worked full-time in April 2010, when she performed housekeeping for a hospital. R. 42-43. King testified that, in an effort to keep her public housing, she worked part-time in June, July, and August 2013 housecleaning for a homecare service. R. 43. Also in an effort to keep public housing, King reported she attempted to volunteer once a month opening the door and giving out toiletries at the outreach homeless program, but she could not perform the work due to her inability to sit, stand, or walk. R. 44. King testified she was unable to maintain public housing because she was not capable of meeting the requirement that she pay her

electric bill and work two hours per week. R. 43.

King reported that since 2004, she suffered from costochondritis, an inflammation in her chest that causes a constant sharp pain. R. 45, 49. King testified that the pain had been getting worse for the preceding ten years and, due to the pain from costochondritis, she was unable to work from 2010 to 2012. R. 49. King further testified that due to the costochondritis, "[i]t's just been pain and inflammation from head to toe pretty much for the last ten years making [her] unable to work, making [her] homeless, just making it difficult to do day-to-day activity." R. 47.

After taking the antibiotic Cipro in 2012, King testified that she experienced paresthesia, numbness, and joint pain making it difficult for her to sit, stand, walk, or lay in one position for more than 15 minutes before she experiences severe pain and numbness in her hands and feet. R. 45, 47-49. King further testified that, two days after taking Cipro, she lost movement on her right side. R. 52.

King testified that she gets short of breath, has migraines, and has "memory loss [and] brain fog." R. 49-50. King testified that her migraines usually last for two or three weeks, but that she had recently had a migraine that lasted for three months. R. 52-53. Without insurance, King explained she cannot see a rheumatologist, obtain a CT scan for her migraines, or obtain an EMG to determine whether she has nerve damage. R. 51.

At the time of the hearing, King reported she was living with her mother in Georgia. R. 47. With respect to her daily activities, King testified that she was "almost confined to a bed" for the previous eight months due to severe pain in her upper and lower back, neck, shoulder, leg and arm. R. 48, 51. King reported that she used a cane to get out of bed, used a portable toilet in her room, and gave herself sponge baths every other day. R. 48. King testified that she could put a frozen meal into the microwave, but that her mother usually took it out for her. R. 50-51.

Although she was able to drive, King stated she did not like to be out for more than 30 minutes. R. 46.[2]

### III. THE ALJ's DECISION

To evaluate King's claim of disability,[3] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ found that King met the insured requirements[4] of the Social Security Act through December 31, 2014, and she had not engaged in substantial gainful activity since April 30, 2010, her alleged onset date of disability. R. 24. At step two, the ALJ found King had the following medically determinable impairments: "urgency of urination; urinary incontinence, unspecified; joint pain in multiple joints; back pain; headaches; paresthesias/numbness; edema and obesity, unspecified." *Id.* The ALJ determined, however, that King did not have "an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, [King] does not have a severe impairment or combination

---

[2] William Porter, a vocational expert, also testified at King's hearing, stating that a hypothetical person with King's age, education, and work experience, who could sit for two hours, stand for one hour, and walk for one hour in an eight-hour workday, would not be capable of performing jobs that exist in significant numbers in the national economy. R. 57.

[3] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of the Social Security Act, be under age sixty-five, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

[4] To qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

of impairments." R. 25-30. Accordingly, the ALJ concluded that King was not under a disability from April 30, 2010 through the date of the ALJ's decision and was ineligible for DIB, or SSI benefits. R. 30-31.

## IV. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v.*

*Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V. ANALYSIS

At the second step of the sequential analysis, the ALJ found King did not have a severe impairment or combination of impairments. R. 25. Because the ALJ found that King did not meet the severity requirement, the ALJ did not proceed to step three of the sequential analysis and denied King's claim for benefits. King alleges the ALJ's finding is not supported by substantial evidence because it is contrary to the opinions of King's treating physician, which the ALJ failed to give specific and supported reasons for rejecting, and it is based on a misrepresentation of King's activities of daily living. Pl.'s Br. in Support of Mot. for Sum. Judg. ("Pl.'s Br.") 2-7.

At step two of the sequential analysis, the claimant must show she has a "medically determinable physical or mental impairment . . . or combination of impairments" that is severe and has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (citing 42 U.S.C. § 423(d)(5)(A), which provides that a claimant "shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof"). A medically determinable impairment "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3) (2012). The ALJ will consider all evidence in the record except the claimant's age, education, and work experience when making this determination. 20 C.F.R. §§ 404.1520(a)(3), (c), 416.920(a)(3), (c).

14

An impairment is severe within the meaning of the Social Security regulations if it imposes significant limitations on the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921.  In contrast, an impairment is *not* severe if it "has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1982).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," which include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b).

In assessing whether a claimant has a severe medical impairment at step two, the ALJ considers any "'symptom-related limitations'—restrictions caused by symptoms, such as pain, fatigue, or weakness—provided that the claimant has 'a medically determinable impairment(s) that could reasonably be expected to produce the symptoms.'" *Botten v. Astrue*, No. 4:09cv57, 2010 WL 114929, at *6 (Jan. 12, 2010) (citing SSR 96–3p).  However, an impairment cannot be established solely through the claimant's statement of symptoms, but must be demonstrated "by medical evidence consisting of signs, symptoms, and laboratory findings."  20 C.F.R. §§ 404.1508, 416.928; *see also* 42 U.S.C. § 423(d)(5)(A).  When the medical evidence shows that the claimant is capable of performing basic work activities, the severity requirement cannot

be satisfied.   SSR 85–28 (1985).   The Commissioner has stated, however, that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe step." *Id.*

### A.     *The ALJ failed to properly consider and explain the weight assigned to the opinions of King's treating physician, Dr. Lorenzo.*

King first challenges the ALJ's decision by arguing the ALJ failed to provide good, specific, supported reasons for assigning "lesser weight" to Dr. Lorenzo's opinions and failed to correctly evaluate pertinent factors when assigning such weight.  Dr. Lorenzo is King's treating physician, and his opinions regarding King's limitations are the only opinions in the record from a doctor who has examined King.

At step two of the ALJ's five-part analysis, the ALJ determines whether the claimant has a severe impairment.  In making this severity determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of treating providers.  A treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.  However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not

16

> entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p (1996).

Even if a treating provider's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at \*5. Those factors are: (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c), 416.927(c); *accord Johnson v. Barnhart*, 434 F.3d at 654.

Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p (1996). This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In determining that King did not have a severe impairment, the ALJ summarized: (1) King's statements contained in her function reports, a letter written by King, and her testimony during the administrative hearing (R. 26-28); (2) the objective medical evidence contained in the record, including records from the emergency department at Grady Memorial Hospital, records from urologist John Lasater, M.D., and progress notes from Southeastern Virginia Health System, including records from King's treating physician David Lorenzo, M.D. (R. 27-28), (3) opinion evidence from two state agency medical consultants (R. 28), and (4) opinion evidence contained in two documents completed by Dr. Lorenzo (R. 28-29). The ALJ proceeded to analyze King's credibility, and found King not fully credible based on inconsistencies within King's statements, as well as inconsistencies between King's statements and the medical record. R. 29-30.

Finally, the ALJ addressed the opinion evidence. R. 30. The ALJ assigned "significant weight" to the opinions of the two state agency medical consultants, Dr. Singh and Dr. Eidex. *Id.* Both state agency consultants concluded that King's impairments were not severe. *Id.* The ALJ further stated:

> because their opinions are those of non-examining physicians, they [are] not entitled to controlling weight, but must be considered and weighed as those of highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Security Act (SSR 96-6p). *Greater weight was placed on the opinions of the physicians that observed, examined and treated the claimant, over that of the State Agency doctors who did not.*

*Id.* (emphasis added). The last sentence of this paragraph is clearly form language that was erroneously left in the opinion, as the ALJ proceeded to assign "lesser weight" to the opinions of Dr. Lorenzo, King's treating physician. *Id.*

18

Dr. Lorenzo, the only physician to give an opinion regarding King's impairments who had examined King, gave opinions on two occasions regarding King's limitations. R. 491-93, 524-25. Dr. Lorenzo found King's impairments would limit her to sitting two hours or less, and walking or standing for one hour or less, in an eight-hour day. R. 491, 524. He further opined that King's symptoms would interfere with her attention and concentration, would cause her to take unscheduled breaks and to need to lie down every hour, and would result in her absence from work more than four days per month. R. 491, 493, 524-25. The only reason offered by the ALJ to support the assignment of lesser weight to Dr. Lorenzo's opinions is the one statement that "his limitations are not supported by the medical evidence of record, per SSR 96-2p." R. 30.

King argues that, when assigning lesser weight to Dr. Lorenzo's opinion, the ALJ failed to properly evaluate the factors, noted above, governing the assignment of weight to a treating provider's opinion that is not accorded controlling weight. 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927(c)(2)-(c)(6) (analyzing the treatment relationship, the support provided for the opinion, its consistency with the record, the credentials of the provider, and other appropriate factors). The Court agrees.

The ALJ offers no analysis of the pertinent factors and discounts Dr. Lorenzo's opinion with one conclusory sentence. The ALJ did identify Dr. Lorenzo as having an M.D., and identified him as King's treating physician. R. 29-30. Accordingly, it is apparent that the ALJ considered Dr. Lorenzo's status as a medical and treating doctor when assessing his opinions. The ALJ discussed, in general, progress notes from Southeastern Virginia Health System, where Dr. Lorenzo practices, without reference to any dates, and summarized Dr. Lorenzo's treatment notes from appointments on August 8, 2013 and January 16, 2014, as well as the evaluation forms completed by Dr. Lorenzo on August 8, 2013 and November 4, 2014. R. 28-29. Other

than this summary of a portion of the medical evidence, there is no discussion of the nature, length, extent, or frequency of Dr. Lorenzo's treatment relationship with King. With respect to the evidence presented in support of Dr. Lorenzo's opinions and the consistency with the record, the ALJ relies completely on the one sentence stating the limitations assigned by Dr. Lorenzo are "not supported by the medical evidence of record." R. 30. This is the entire analysis offered by the ALJ for discounting Dr. Lorenzo's opinions.

By failing to consider the necessary factors and recite reasons for assigning lesser weight to King's treating physician than was assigned to the non-examining state agency physicians, the ALJ has failed to provide sufficient legal analysis to allow meaningful review by this Court and remand is necessary. When the ALJ fails to adequately explain the reasons for her ruling, Fourth Circuit precedent requires remand. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013); *Fox v. Colvin*, 632 Fed. App'x 750, 756 (4th Cir. 2015).

> A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. If the reviewing court has no way of evaluating the basis for the ALJ's decision, then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."

*Radford*, 734 F.3d at 295 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)) (additional citations omitted).

In a factually similar case, where the ALJ gave a one sentence explanation for assigning "less weight" to the treating physician's opinion because the limitations in the opinion were "not well-supported by the medical record," the Fourth Circuit found meaningful review could not be conducted. *Fox*, 632 F. App'x at 756. Remand was necessary because, "[s]uch a cursory and conclusory analysis does not provide any reason, let alone a "good reason[],' why the ALJ

concluded that [the treating physician's] opinion was inconsistent with other medical findings."
*Id.*

Because the ALJ offered insufficient legal analysis for the decision to discount the weight given to Dr. Lorenzo's opinions resulting in a finding that King does not have a severe impairment, it is impossible to find substantial evidence to support the ALJ's decision. This recommendation does not reflect any opinion by the Court regarding the appropriate weight to assign to Dr. Lorenzo's opinions. Rather, the ALJ's failure to offer any discussion of the pertinent factors leaves the Court with no alternative but to remand. On remand, the ALJ must address the factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c). If Dr. Lorenzo's opinions are given less than controlling weight, the ALJ must provide specific and supported reasons for assigning Dr. Lorenzo's opinions less weight.

**B.** *King has not identified exceptional circumstances necessitating rejection of the ALJ's credibility assessment.*

King next asserts that the ALJ incorrectly found her statements about the intensity, persistence, and limiting effect of her symptoms not entirely credible based on a misrepresentation of King's statements. Pl.'s Br. 7-11.

To make her credibility determination, the ALJ engaged in the two-step inquiry detailed in 20 C.F.R. §§ 404.1529 and 416.929 by evaluating: (1) whether an underlying medically determinable impairment was shown that could reasonably be expected to produce the claimant's symptoms, and (2) if so, the extent to which such symptoms limited the claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects. *See Craig*, 76 F.3d at 594-95. The ALJ found that King's medically determinable impairments could reasonably be expected to cause her symptoms, but that King's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not fully credible for the

reasons explained in this decision." R. 27.

This Court must give great deference to the ALJ's credibility determinations. The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of King's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

King first attacks the ALJ's credibility determination by suggesting that the ALJ improperly discredited King's assessment of her daily activities due to inconsistencies between King's hearing testimony and statements made in a function report. R. 29. The ALJ discounted King's hearing testimony that "she performed few, if any, household chores due to severe pain," based on her representation in a function report that she was able to "take care of personal grooming, cook meals for the whole day, clean the bathroom, kitchen and bedroom, take trash out, walk to the store once a week, do the laundry, use public transportation, go to Walmart, volunteer at church two times a month, watch TV and drive." R. 29. King does not deny the statements were made in her function report, but argues the ALJ took the statements out of context. Pl.'s Br. 8-9. King explains that a complete reading of the function report reveals that, while she can cook, she could not cook on the stove due to the pain of standing; she is in pain after cleaning for 15 minutes in the morning, as well as when she goes to the trash, mailbox, store and laundry; she only shops at Walmart once a month for food; the church only allows her to volunteer to keep her spirits up; and, while she can drive, she does not. *Id.* King offers a more complete description of what was stated in her function report, but does not point out any errors made in the ALJ's summary of the report.

Second, King takes issue with the ALJ's taking note of the inconsistency between her hearing testimony that she was confined to her bed and needed to take sponge baths, and her testimony that she was able to work part-time for three months in order to maintain her public housing. Pl.'s Br. 9-10. King asserts the ALJ erred by not discussing that she was only working for two hours a week, she could not perform volunteer work for four hours a day one day a month (consisting of opening the door and giving out toiletries), and she lost her housing due to her inability to pay her electric bill or maintain the work requirement. *Id.* Again, King does not show that the ALJ inaccurately described the work, only that the ALJ did not paint a detailed picture of the work. The ALJ relied on the discussion of King's part-time work to find, "[a]lthough that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than she has generally reported." R. 29. While the ALJ's characterization of King's few work hours as "part time work" is a stretch, the conclusion reached--that her daily activities have at times been somewhat greater than reported--appears to be a fair conclusion.

Third, King asserts that her statements regarding the use of a cane for eight months prior to the hearing, which took place in October 2014, were consistent with notes from Dr. Lorenzo in November 2014 that she needed a cane. Pl.'s Br. 10. The ALJ writes, King "stated she uses a cane that was not prescribed by a doctor. She said she bought the cane when she came back to Georgia. However the records show that Dr. Lorenzo only reported the need for a cane in his statement dated November 2014." R. 30. The ALJ is pointing out that the first indication in the record from a medical source that King needed a cane to ambulate came after King had been using a cane for eight to nine months. Again, this statement by the ALJ is not a misrepresentation, though the import of the information is questionable.

23

Finally, King asserts that, when discounting her credibility, the ALJ inappropriately relied on King's ability to provide her attorney with an 11-page letter plus attachments detailing her impairments, which was included in the record. Pl.'s Br. 10, R. 498-514. King states that the ALJ failed to explain how King's providing this letter "demonstrated an ability to work full time at competitive employment." *Id.* This misstates the ALJ's discussion of the letter. The ALJ stated that, during the hearing, King testified she "has memory problems and brain fog because of her condition," but, even if King did not write the letter, "the evidence before me indicates that she has more ability to function from a work related standpoint than what she has alleged." R. 29-30. The ALJ relies on the detail King provided in the letter regarding her impairments, how they affect her, and the instructions to her attorney on what he needed to get the judge to understand about King's medical issues. R. 30. Contrary to King's assertion in her brief, the ALJ does not find King capable of full-time work based on her providing this letter to her attorney. Instead, the ALJ referenced the letter in finding that King has "more ability to function from a work related standpoint" than she has alleged. The ALJ did not commit error by addressing the detailed letter from King when discussing the reasons for discounting King's credibility.

The Court does not find support for King's argument that the ALJ improperly discounted King's credibility by misrepresenting King's statements. In summarizing the statements, the ALJ removed some context, but not in a manner that resulted in a misrepresentation. In making her credibility determination, the ALJ properly considered the objective medical and other evidence of record, including factors specified by regulation, such as King's daily activities, and the duration and intensity of her symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). While the assessment of King's credibility could have been more thorough, the ALJ's assessment was

24

not unreasonable, contradicted by other factual findings, or insufficient. For these reasons, the record in this case fails to show any "exceptional circumstances" that would lead the Court to disturb the ALJ's credibility determination, and substantial evidence supports the ALJ's determination that King's statements about her symptoms are not fully credible.

The ALJ, nevertheless, has failed to construct the analytical bridge necessary to get from the determination that King is not fully credible to the conclusion that she has no severe impairment. Further, as discussed above, the ALJ's failure to offer any analysis supporting the assignment of weight to the treating physician's opinion evidence in the record requires remand.

## VI. **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 14) be GRANTED, defendant's motion for summary judgment (ECF No. 16) be DENIED, the decision of the Commissioner be VACATED, and the case be REMANDED for further proceedings consistent with this report and recommendation. Specifically, the ALJ should reevaluate the weight attributed to Dr. Lorenzo's opinions pursuant to part V, section A of this report and recommendation.

## VII. **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with

a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

*RJK* /s/

**Robert J. Krask**
**United States Magistrate Judge**

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 1, 2016